UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JEF D'ENGLE,

                              Plaintiff,

              - against -                                    14-cv-8236 (GBD)

THE CITY OF NEW YORK, THE PORT AUTHORITY
OF NEW YORK AND NEW JERSEY, Police Officer
MAURICE MURPHY, Police Officers "JOHN DOE"          **AMENDED COMPLAINT**
numbers 1-3 (the names of the "DOE" defendants being
fictitious, and their true names being unknown to the
plaintiff), and AMERICAN AIRLINES, INC., d/b/a
AMERICAN AIRLINES,

                              Defendants.

-----------------------------------------------------------------------X

        Plaintiff, JEF D'ENGLE, by his attorney, James M. Maloney, as and for his Amended

Complaint against the above-named defendants, declares as follows:


                              **INTRODUCTION**

        1. This action seeks redress by a non-citizen of the United States who, on or about

October 19, 2011, was being transported through the United States from Belgium (Europe) to

Jamaica (West Indies) in international commerce by a common carrier of air passengers.  Packed

in his checked baggage, which the passenger (Plaintiff, a martial artist) had checked with the

common carrier for his entire passage from Belgium to Jamaica, was a martial-arts weapon

known as a nunchaku, consisting of two sticks connected by a cord or chain, the mere possession

of which has been defined as a crime by the State of New York since 1974.

        2. Although, as more fully appears herein, nunchaku are specifically permitted in checked

baggage under federal regulations and according to public notice of same, the Plaintiff's checked

baggage was returned to him by the common carrier at John F. Kennedy International Airport

("JFK"), where local police acting under color of state law arrested and detained Plaintiff and

subjected him to humiliating, degrading, terrifying and life-threatening conditions, ultimately coercing his plea of guilty to a violation, all on the putative basis that he had "possessed" nunchaku "within" New York.  These actions, taken by persons acting under color of state law, have deprived Plaintiff and others of rights guaranteed by the Constitution and laws of the United States, and have been taken in violation of the Constitution and laws of the United States and in a manner offensive to international and federal/state comity and to human dignity.

3. New York, and officers acting under color of its law, have no sovereign interest whatsoever in, and no legitimate authority for, applying and/or enforcing the state's absolute prohibition of any and all possession of nunchaku as against a passenger in international commerce who had checked his luggage containing a nunchaku with a common carrier of air passengers for his entire passage from Belgium to Jamaica, all in violation of no statute or regulation of the United States, and who complied fully with all requests by authorities.

4. This action was commenced on October 15, 2014, by the filing of a complaint (ECF Document 2).

5. The original complaint did not name THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY as a defendant.

6. The original complaint mistakenly identified Police Officer "M. MURPHY" (named herein as MAURICE MURPHY), the arresting officer, as a member of the New York City Police Department ("NYPD").  This mistake derived in principal part from Plaintiff's retention of a property clerk invoice bearing the "Police Department City of New York" logo on which P.O. M. Murphy is listed as the arresting officer, a true copy of which was provided to the General Counsel of  THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, together with a true copy of the complaint (ECF Document 2), on or about November 3, 2014, together with correspondence from Plaintiff's counsel describing the aforementioned mistake of fact.

7. This amended pleading is being filed "as a matter of course" under F.R.C.P. 15(a)(1) by virtue of its being filed within "21 days after service of a motion under Rule 12(b)," namely, that made by Defendant AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES (ECF

Documents 10-12, filed on December 12, 2014).

8. This amended pleading is being filed as against THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and its officers pursuant to the "relation back" provisions of F.R.C.P. 15(c).

## PARTIES

9. Plaintiff is a natural person and a citizen of South Africa.  In 2011, Plaintiff and his wife Barbra d'Engle, also a citizen of South Africa, purchased air transportation services from Defendant AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES, also identified in this litigation as AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES, to fly from Brussels, Belgium, where they were living at the time, to Kingston, Jamaica, with such transportation scheduled to depart Brussels at 10:00 a.m. on October 19, 2011, and to arrive in Kingston at 7:30 p.m. on October 19, 2011.  Plaintiff was 55 years of age as of that date.

10. Defendant THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY is a body corporate and politic formed by interstate compact and having the powers and jurisdiction conferred upon it by the legislatures of the states of New York and New Jersey.  The  Port Authority Police Department ("PAPD") is, in turn, a duly authorized public authority and police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, and acting under the direction and supervision of defendant THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY. THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and PAPD are responsible for the appointment, training, supervision, promotion and discipline of police officers, including those identified in the following paragraph.

11.  Defendants Police Officers MAURICE MURPHY and "JOHN DOE" number 1 (the names of all the "DOE" defendants being fictitious, and their true names being unknown to Plaintiff) were, at all times relevant herein, officers, employees and agents of THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and are police officers in the PAPD.

Defendants Police Officers MAURICE MURPHY and "JOHN DOE" number 1 are sued in both their individual and official capacities.

12. Defendant THE CITY OF NEW YORK is a municipal corporation organized under the laws of the State of New York, and maintains the New York City Police Department.  The New York City Police Department ("NYPD") is, in turn, a duly authorized public authority and police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, and acting under the direction and supervision of defendant THE CITY OF NEW YORK.  THE CITY OF NEW YORK  and NYPD are responsible for the appointment, training, supervision, promotion and discipline of police officers, including those identified in the following paragraph.

13. Defendants Police Officers "JOHN DOE" numbers 2-3 (the names of the "DOE" defendants being fictitious, and their true names being unknown to Plaintiff) were, at all times relevant herein, officers, employees and agents of the NYPD, acting under color of state law. Defendants Police "JOHN DOE" numbers 2-3 are sued in both their individual and official capacities.

14. Defendant AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES (see, e.g., caption, ECF Document 10), is a business corporation existing under the laws of Delaware and licensed to do business in New York, with a principal office in Fort Worth, Texas.

## JURISDICTION AND VENUE

15. This action as against THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, THE CITY OF NEW YORK, Police Officer MAURICE MURPHY, and Police Officers "JOHN DOE" numbers 1-3, arises under the Constitution and laws of the United States and is accordingly brought pursuant to the provisions of 42 U.S.C. §§ 1983 *et seq*.

16. This Court has subject matter jurisdiction over the causes of action asserted against THE CITY OF NEW YORK, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Police Officer MAURICE MURPHY, and Police Officers "JOHN DOE" numbers 1-3,

pursuant to 28 U.S.C. § 1331.

17. This Court has subject matter jurisdiction over the causes of action asserted against AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES (hereinafter, "AA"), pursuant to 28 U.S.C. § 1334(b), on the basis that, at the time of filing the initial complaint (ECF Document 2), this was a civil proceeding "related to cases under title 11," as more fully appears herein. Alternatively, this Court has subject matter jurisdiction over the causes of action asserted against AA under 28 U.S.C. § 1332 (alienage jurisdiction) and/or under 28 U.S.C. § 1331 on the basis that AA engaged in joint action with state actors to deprive Plaintiff of his federal rights.

18. Venue is properly placed in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## CONTINUATION OF JURY DEMAND

19. Plaintiff has demanded and continues to demand a trial by jury in this action.

## BACKGROUND

20. On or about October 19, 2011 (the "Date of the Arrest"), Plaintiff was traveling from Belgium to Jamaica (being eventually bound for Grenada) in the company of his wife, Barbra d'Engle, who is not a party to this action.

21. Plaintiff's passage from Brussels, Belgium to Kingston, Jamaica included three "legs," all on AA flights: (i) Brussels to New York (JFK), on Flight AA 471; (ii) New York to Miami, on Flight AA 1175; and (iii) Miami to Kingston, on Flight AA 1049.

22. In Brussels, their city of origination, Plaintiff and his wife had checked their non-carry-on baggage, consisting of backpacks, for transport from Brussels through to Kingston.

23. Plaintiff is a martial artist who trains with nunchaku, also known as "nunchucks" or "chuka sticks," which consist of a pair of wooden sticks connected by a chain or cord.

24. Plaintiff is also an experienced professional sailor, and, while aboard sailboats and other watercraft, uses a folding knife, which locks in the open position for safety.

25. According to the then-current online version of the United States Transportation Security Administration's "Prohibited Items List" (the "TSA PIL"), an updated copy of which (substantially identical to the version current on the Date of the Arrest) is annexed hereto as **Exhibit A** (see also the Transportation Security Administration's online version at http://www.tsa.gov/traveler-information/prohibited-items),[1] nunchaku (also known as "nunchucks" or "chuka sticks") are among the martial arts or self-defense items that may be transported in checked baggage but not in carry-on, and knives are among the "sharp objects" that may be transported in checked baggage but not in carry-on.

26. Plaintiff, wishing to have a nunchaku at his final destination for martial-arts training, packed his nunchaku in his checked baggage.  He also packed a folding knife, wishing to have it at his final destination for use while sailing.

27. When checking his bags with AA in Brussels, Plaintiff specifically inquired of the AA employee or agent accepting the bags whether they would be checked through to Kingston, and the AA employee or agent accepting the bags stated that they would, which, as it turned out, was not the case (see paragraph 29, *infra*).

28. New York was not a "destination city" in the context of warnings by TSA of the applicability of local laws, *cf.* paragraph 68(b), *infra*.  Plaintiff's only reason for passing through New York, and for entering the United States at all, was to reach Jamaica from Belgium, and he did so with his person and possessions under the care of AA and its agents and employees.

29. Upon Plaintiff's arrival at JFK Airport on the Date of the Arrest, AA and/or its agents and employees returned Plaintiff's and his wife's checked baggage to them and refused to accept it for checking aboard the connecting flight until Plaintiff and his wife had passed through a security checkpoint with their checked baggage.

---

[1] The Transportation Security Administration's "Prohibited Items List" as it appeared online on the Date of the Arrest, noting that nunchaku are "OK" in checked baggage (not carry-on) is archived at https://web.archive.org/web/20111018080953/http://www.tsa.gov/travelers/airtravel/ prohibited/permitted-prohibited-items.shtm.

30. Plaintiff was surprised by this procedure, given that he had been informed by AA that the bags would be checked through to Kingston, see paragraph 27, above.

31. When asked about the contents of his checked baggage at the security checkpoint, Plaintiff, reasonably believing that the folding knife and nunchaku in his backpack were permissible in checked baggage, readily disclosed their presence to airport security personnel. Plaintiff, believing himself to be in violation of no law, thereafter fully complied with all requests made by airport security personnel.

32. The above disclosure, and the subsequent inspection of Plaintiff's luggage, resulted in a discussion between Plaintiff and an unidentified airport security guard, who told Plaintiff that he could not keep the folding knife and nunchaku that were in his checked baggage and that they would be "confiscated." Plaintiff stated that he did not care about the nunchaku, but that the knife had sentimental value, having served him well while sailing during several ocean crossings. The unidentified airport security guard replied that he would see what he could do to get Plaintiff's knife back to him. Plaintiff thanked him and went on his way, with his wife, to board their flight, AA 1175 to Miami.

33. Before Plaintiff and his wife boarded their flight, the unidentified airport security guard came running up to them and told Plaintiff that he should follow him, as he (Plaintiff) might be able to get his knife back if he did. Plaintiff followed the unidentified airport security guard away from the boarding area.

34. Police Officer MAURICE MURPHY and PAPD Police Officer "JOHN DOE No. 1" had meanwhile seized Plaintiff's checked backpack and Plaintiff's knife and nunchaku.

35. Police Officer MAURICE MURPHY and PAPD Police Officer "JOHN DOE No. 1" thereafter approached Plaintiff once he had left the boarding area. Police Officer "JOHN DOE No. 1" ordered Plaintiff to sit on a bench.

36. Police Officer MAURICE MURPHY then approached Plaintiff and asked him what he was doing with "nunchucks." When Plaintiff stood up and politely tried to explain that he had them in his checked baggage and not on his person, Police Officer MAURICE MURPHY

shouted at him in a menacing tone the words: "Sit the fuck down and shut up, motherfucker!" Police Officer MAURICE MURPHY then added: "You are going to get fucked up."  This exchange occurred in the immediate presence of, and was heard by, Plaintiff's wife, Barbra d'Engle, frightening her and putting her in reasonable fear that her husband might be harmed by the police.  As more fully appears herein, Plaintiff was thereafter arrested and harmed by the police while in their custody.

## THE ARREST AND DETENTION OF PLAINTIFF

37. Police Officer "JOHN DOE No. 1" thereafter told Plaintiff that he would be arrested because "nunchucks are illegal."  Police Officer "JOHN DOE No. 1" thereafter informed Plaintiff that he would be "locked up" at least overnight and that, if he was "lucky" and cooperative, he might be back to the airport by the next day.  Plaintiff asked Police Officer "JOHN DOE No. 1" if his wife Barbra could come with him, to which Police Officer "JOHN DOE No. 1" replied in the negative, and that she should instead travel on to Jamaica without Plaintiff.  Barbra d'Engle instead chose to wait in the airport during her husband's absence, with no means of communicating with him during that time and in fear for his well-being.

38. Before he was handcuffed and taken from the airport, Plaintiff told Police Officer "JOHN DOE No. 1" that Barbra did not have any cash, and asked if he could withdraw some so that she could at least buy food and water while she waited for him.  Plaintiff was led to an ATM machine with both police officers holding him by the arms.  During the walk to and from the ATM machine, Police Officer MAURICE MURPHY kept repeating that Plaintiff was going to be "fucked up" and asking, "Did you think you could get away with it, motherfucker?"

39.  After Plaintiff was allowed to give Barbra cash, both police officers searched Plaintiff's person.  This was done in public view and in the view of Barbra.  In the process, Police Officer MAURICE MURPHY squeezed Plaintiff's genitals roughly, eliciting pain and humiliating Plaintiff in front of his wife and onlookers.

40. Plaintiff is an asthmatic who uses a Ventolin® inhaler to treat asthma attacks.

Plaintiff asked Police Officers M. MURPHY and "JOHN DOE No. 1" if he could take his Ventolin® inhaler with him, to which they initially replied in the negative. Plaintiff told them that he sometimes had asthma attacks and needed to keep it with him. The officers eventually agreed that Plaintiff could take the Ventolin® with him, but stated that he would not be allowed to use it.

41. Police Officers MAURICE MURPHY and "JOHN DOE No. 1" then handcuffed Plaintiff with his hands behind his back and removed him from the airport via police car, banging Plaintiff's head against the police car as they shoved him into the car with his hands cuffed behind his back.

42. At the first police facility to which he was transported, which is believed to be the 113th Precinct of the NYPD, Plaintiff was searched again, his Ventolin® was taken from him, and he was placed in a cell. The arresting officer, PAPD Police Officer M. MURPHY, remained at the facility for some time thereafter.

43. Plaintiff began experiencing asthma symptoms and asked Police Officer MAURICE MURPHY for the Ventolin® inhaler. Police Officer MAURICE MURPHY denied that request. Plaintiff replied that people die from asthma, whereupon Police Officer MAURICE MURPHY went to ask NYPD Police Officer "JOHN DOE No. 2" if the Ventolin® inhaler could be given to Plaintiff. NYPD Police Officer "JOHN DOE No. 2" told Plaintiff that if he wanted to use the Ventolin® inhaler he would have to go to the hospital, but that doing so would only delay his "processing" and cause him to be in custody much longer, maybe even by a day or more. Worried about his wife being alone in the airport for an extended period, Plaintiff sought to contact her before going to a hospital.

44. Plaintiff asked if he could call his wife, Barbra, but NYPD Police Officer "JOHN DOE No. 2" denied that request on the putative ground that the cell phone in her possession had an international number and that such calls were not permitted. Plaintiff, under extreme duress, accordingly declined to go to a hospital even though his asthma symptoms were worsening.

45. Plaintiff was thereafter searched and handcuffed again and transported to another

facility, believed to be Queens Central Booking.  Plaintiff again asked to use his asthma inhaler, but that request was again denied.

46.  Plaintiff asked for water and was directed to a water fountain in the cell, located above an unflushed toilet.

47.  Hours later, after Plaintiff's breathing improved, Plaintiff asked for food, and was offered were cheese sandwiches and milk, nothing else.  Plaintiff, a vegan, explained that he did not eat animal products, but no other food than the cheese and milk, which he did not eat, was ever offered to him.

48.  Plaintiff was thereafter taken to another cell to wait for an attorney before being arraigned. The cell was about 20 feet long and 12 feet wide, foul-smelling, and overcrowded. The cell contained a toilet that was backed up because one of the other prisoners had thrown food and packaging into it, and the toilet had been used repeatedly for both feces and urine.  The floor around the toilet were covered with liquid from the toilet, making it impossible to approach the adjacent drinking fountain without walking through the unsanitary liquid covering the floor. There was a bench about eight feet long along the back wall, and three interview cubicles with a small swivel chair in each one.  One of the other prisoners was sleeping on the bench, and the interview cubicles each had someone in it trying to sleep on a swivel chair.  Most of the remaining prisoners slept on the floor.  Plaintiff, rather than lie on the floor, stood through most of the night, from about 10:00 p.m. until after 9:00 a.m. the next morning (October 20, 2011).

49.  During the night, Plaintiff's feet and ankles became swollen, painful, and edematous from prolonged standing.  His asthma symptoms temporarily abated, but then worsened again for the reasons described below.

50.  At approximately 8:00 a.m. on October 20, 2011,  NYPD Police Officer "JOHN DOE No. 3" walked around the cells burning incense, which triggered and worsened Plaintiff's asthma symptoms, but NYPD Police Officer "JOHN DOE No. 3" refused to stop exposing Plaintiff to the smoke or to allow him to use his inhaler.

51.  At approximately 9:15 a.m. on October 20, 2011, Plaintiff was called to speak to a

public defender, who told Plaintiff what the charges were (criminal possession of a weapon under New York Penal Law § 265.01 for possession of a "chuka stick") and further told Plaintiff that he had two options, the first being to defend the matter and ask for a new appearance date (likely being required to surrender his passport and possibly to post bail if he were not held in custody), and the second being to plead guilty to a violation, pay a fine, and be released promptly. Plaintiff did not wish to stay in the United States to defend the charges and, still suffering from the second asthma attack and fearful of the possibility of being held longer, was afraid that he would die while in custody and never see his wife again. He was also suffering from caloric deprivation, dehydration, edema of the feet and ankles, and prolonged sleep deprivation. Under all of those circumstances, under extreme duress, he opted for the guilty plea and fine.

52. In sum, while in custody Plaintiff JEF D'ENGLE was subjected to degrading, humiliating, harmful, and hazardous conditions, including but not limited to: (i) being confined in a cell with numerous other individuals where there was no room to sit or lie down, no working toilet, and no reasonable access to water; (ii) being effectively deprived of food because he is a vegan and the only food available to him while he was in custody contained animal products; (iii) being repeatedly deprived of access to his Ventolin® inhaler while suffering two asthma attacks; (iv) being subjected to respiratory irritants (burning incense held by a police officer) that exacerbated his asthma while in custody; (v) being forced to stand for protracted periods, causing edema and swelling in his lower extremities; (vi) being deprived of sleep for protracted periods in excess of 24 continuous hours; (vii) being subjected to verbal and physical abuse and fear of physical injury by Police Officer MAURICE MURPHY; and (viii) being physically injured when being pushed into the police car with his hands cuffed (striking his head).

53. On October 20, 2011, after being subjected to the above treatment, Plaintiff JEF D'ENGLE was brought before a New York City Criminal Court judge and given the opportunity to plead guilty to a violation and pay $370 in fines and surcharges, which he did under threat of being held further pending resolution of the charges, being separated from his wife under duress that included the reasonable possibility of dying from an acute asthma attack while separated

from her, and being forced to remain in the United States, a country that he had entered for the sole purpose of traveling from Belgium to Jamaica, if he wished to defend the charge of criminal possession of a weapon under New York Penal Law § 265.01 for possession of a "chuka stick" even though such packing of the "chuka stick" in his checked baggage was in full accord with the TSA PIL and other published guidelines for travelers through the United States.

## THE UNLAWFULNESS OF THE ARREST

54. New York Penal Law § 265.00 (14) (one of two subsections so numbered) defines a "chuka stick" (i.e., nunchaku) in substantial part as follows: "any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking . . ."

55. New York Penal Law §§ 265.01 and 265.02 define the possession of a "chuka stick" (i.e., nunchaku) as a Class A misdemeanor and as a Class D felony, respectively.

56. Under the vagueness doctrine, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997); *accord United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999), cert. denied 531 U.S. 823 (2000); *see also Rogers v. Tennessee*, 532 U.S. 451, 459 (2001) (holding that right to fair warning "bear[s] on the constitutionality of attaching criminal penalties to what previously had been innocent conduct"); *Marks v. United States*, 430 U.S. 188, 191 (1977) ("[P]ersons have a right to fair warning of that conduct which will give rise to criminal penalties."). Due process requires that a criminal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Under the foregoing standards, a foreign national traveling by air from Brussels, Belgium to Kingston, Jamaica and passing

through the United States only for the purpose of such travel and with no intention to retrieve the nunchaku from his luggage while in the United States could not reasonably have been expected to be on notice that having nunchaku in his checked baggage (in conformity with the very information publicly provided by the TSA, a United States government agency) could have amounted to criminal conduct (see TSA PIL, Exhibit A hereto).

57.  New York's statutory prohibition against the mere possession of nunchaku or "chuka sticks," as applied to such "possession" in the checked baggage of an international traveler merely passing through an airport in the United States, was and is void for vagueness as applied.

58.  The void-for-vagueness doctrine is not only a due process principle giving rise to a federal constitutional right, but is also an even more fundamental and historically more ancient principle of criminal justice long recognized by the State of New York, *see, e.g.*, *People v. Stuart*, 100 N.Y.2d 412, 418-19, 765 N.Y.S.2d 1, 3 (2003).

59. The New York bill that purportedly made any and all possession of nunchaku a crime was signed into law on April 16, 1974, and became effective on September 1, 1974.

60. A memorandum from the State of New York Executive Department's Division of Criminal Justice Services to the office of the Governor dated April 4, 1974, urging the Governor not to sign the bill into law, pointed out that nunchaku have legitimate uses in karate and other martial-arts training, and opined that "in view of the current interest and participation in these activities by many members of the public, it appears unreasonable—and perhaps even unconstitutional—to prohibit those who have a legitimate reason for possessing chuka sticks from doing so." A true copy of said memorandum is annexed hereto as **Exhibit B**.

61. Since 1974, when the State of New York instituted its total ban on "chuka sticks," many courts outside the State of New York have recognized that the nunchaku has socially acceptable uses both within and without the martial arts.  For example:

(a) In 1981, an Arizona appellate court sustaining a conviction for criminal possession of nunchaku in an automobile nonetheless recognized that nunchaku have socially acceptable purposes, noting that "the use of nunchakus in the

peaceful practice of martial arts or the possession for such use is not a crime."
*State v. Swanton*, 629 P.2d 98, 99 (Ariz. Ct. App. 1981).

(b) In 1982, the Supreme Court of Hawaii recognized that, in ancient Okinawa, "nunchakus developed into a defensive weapon against the samurai's sword.  Today, nunchaku sticks are widely used in the martial arts to build up dexterity, timing, mind and body coordination and aids in developing a larger sphere of consciousness around an individual."  *State v. Muliufi*, 643 P.2d 546 (Haw. 1982).

(c) In 1983, a District of Columbia appellate court noted that "it is worth making a few further observations about the nunchaku.  Like the courts of other jurisdictions, we are cognizant of the cultural and historical background of this Oriental agricultural implement-turned-weapon.  We recognize that the nunchaku has socially acceptable uses within the context of martial arts and for the purpose of developing physical dexterity and coordination." *In re S.P.*, *Jr.*, 465 A.2d 823, 827 (D.C. 1983).

(d) In 1984, an Ohio appellate court reversed a criminal conviction for possession of nunchaku, holding that "the evidence tends to indicate that the device was used only for lawful purposes" and that "[m]ere possession of an otherwise lawful article . . . does not make it illegal."  *State v. Maloney*, 470 N.E.2d 210, 211 (Ohio Ct. App. 1984).

62. New York lacks any sovereign interest whatsoever in prohibiting the possession of nunchaku in the checked baggage of foreign citizen martial artists passing through New York's airports who have no intention of retrieving such nunchaku from their luggage while in  New York and no intention of remaining in New York, all of which was the case with Plaintiff.

63.  Police Officer MAURICE MURPHY and Police Officer "JOHN DOE No. 1" could simply have confiscated Plaintiff's nunchaku, as they did with his knife, and allowed him to proceed on his way to Jamaica with his wife, rather than arrest him, torment him, and cause him

to be subjected to the above-described degrading, humiliating, harmful, and hazardous conditions, all as a consequence of his mere possession in his checked baggage of two sticks connected by a cord or chain, which he had placed there in the reasonable and accurate belief that such placement and carriage was in accord with the laws and regulations of the United States, and in the reasonable and accurate belief that such placement and carriage was not a crime.

64.   Upon information and belief, local police and airport security personnel in California, (a state that, like New York, bans all or virtually all possession of nunchaku under threat of criminal prosecution) simply confiscate any nunchaku found in the checked baggage of international travelers passing through California's airports rather than subject them to the harsh consequences of an arrest for victimless conduct that is not clearly proscribed in that setting.

65.   Upon information and belief, Police Officer MAURICE MURPHY and/or Police Officer "JOHN DOE No. 1" confiscated Plaintiff's folding knife, also found in his checked baggage, but never charged him with any crime (e.g., "gravity knife") for "possessing" it.

66.   Given all of the foregoing, including and especially the vagueness of the criminal statute as applied under the circumstances present and the lack of any sovereign interest in applying the criminal statute as against Plaintiff, the arrest of Plaintiff by Police Officer MAURICE MURPHY and Police Officer "JOHN DOE No. 1" was wrongful, unconstitutional, and in derogation of the rights of international travelers passing through the United States.

## ALLEGATIONS RELATING TO AMERICAN AIRLINES

67. Plaintiff first notified AA, through counsel, of the underlying facts herein on or about October 28, 2011, which was nine days after the Date of the Arrest.

68. On or about November 9, 2011, AA, through counsel, responded to Plaintiff by means of a two-page letter that: (a) admitted (on page 1) that the only "notice" AA gave its international passengers flying through the United States that their bags would be returned to them enroute (as opposed to being checked through to their final destination) was by means of a *link* provided on

an AA web page to the website of the U.S. Customs and Border Protection ("CBP") (thereby admitting that AA did not directly inform its passengers of that information); (b) asserted that New York was *not* a "destination city" for Plaintiff for tariff applicability purposes (page 1) but nonetheless implied that New York *was* a "destination city" for Plaintiff for purposes of warnings by TSA of the applicability of local laws (page 2) (the former is correct; the latter is not); (c) asserted limitations on damages under the "Montreal Convention" (page 2); and (d) denied any responsibility for the harms that Plaintiff had suffered while flying from Belgium to Jamaica exclusively with AA (page 2).  A true copy of AA's two-page letter is annexed hereto as **Exhibit C**.  A true copy of a printout of the AA web page referenced in subparagraph (a), above, is annexed hereto as **Exhibit D**.

69. In or about November 2011, AA and its affiliates filed a Chapter 11 bankruptcy petition in this District (Case No. 11-15463 and related cases) (the "AA Bankruptcy"), following which Plaintiff, through counsel, filed a Proof of Claim in Bankruptcy Court, asserting liquidated damages under the "Montreal Convention" on behalf of both Plaintiff and his wife ("Claim 6").

70. On or about November 8, 2013, AA filed an objection (the "Ninety-Fourth Omnibus Objection") to Claim 6 and other claims on the ground that they were claims that were covered by insurance.

71. On or about December 7, 2013, Plaintiff, through counsel, timely filed a Response to the Ninety-Fourth Omnibus Objection.

72. On or about December 9, 2013, AA, through counsel, provided Plaintiff with proof of insurance coverage (at 93%) for the claims asserted in Claim 6.  A true copy of that correspondence is annexed hereto as **Exhibit E**.

73. Upon information and belief, *see Ireland v. AMR Corp.*, 20 F. Supp. 3d 341, 343 (E.D.N.Y. 2014), discussed *infra* at ¶ 82, on or about December 9, 2013, the automatic stay in the AA Bankruptcy was lifted, but AA's counsel did not mention this in their communications

with Plaintiff's counsel on that same date or in their communications with Plaintiff's counsel in the days following.

74. On or about December 10, 2013, AA, through counsel, notified Plaintiff that AA would adjourn the hearing on the Ninety-Fourth Omnibus Objection with respect to Claim 6. A true copy of correspondence confirming same is annexed hereto as **Exhibit F**.

75. The hearing on the Ninety-Fourth Omnibus Objection with respect to Claim 6 was never rescheduled and was never held.

76. On or about February 27, 2014, AA, through counsel, sent an email with an attached claim withdrawal form (a "Notice of Withdrawal of Claim(s)") to Plaintiff, through counsel, asking when Plaintiff's claim (Claim 6) would be withdrawn. A true copy of that email is annexed hereto as **Exhibit G**.

77. On or about October 1, 2014, Plaintiff, through counsel, contacted AA, through counsel, in an effort to stipulate to a lifting of the automatic stay to allow this action to proceed, and was informed by AA counsel that the stay had already been lifted.

78. On or about October 15, 2014, Plaintiff commenced this action by the filing of a complaint (ECF Document 2), in which he alleged at ¶ 84:

> The breach of the duty described at paragraphs 57-95, above, by AMERICAN AIRLINES, INC., d/b/a AMERICAN AIRLINES, has caused or contributed to all of the harms and losses suffered by Plaintiff as hereinbefore alleged, for which Plaintiff seeks compensatory damages, whether as limited by the "Montreal Convention" (i.e., Article 24 of the Warsaw Convention, as amended by Montreal Protocol No. 4) or under the application of more generally applicable principles of tort law to the exclusion of said Convention's putative limitations, *see, e.g., Acevedo-Reinoso v. Iberia Líneas Aéreas de España S.A.*, 449 F.3d 7 (1st Cir. 2006).

The foregoing language, asserting that Plaintiff's damages were available "whether as limited by the 'Montreal Convention' . . . or under the application of more generally applicable principles of tort law to the exclusion of said Convention's putative limitations [citing case]" did not amount to an "alleg[ation] that the Montreal Convention applies," but AA has subsequently

and repetitiously taken the position that ¶ 84 of the original complaint made such a concession, see ECF Document 12, page 6 of 20, third line from bottom (AA memorandum of law in support of Rule 12 motion) (specifically citing ¶ 84 for the above-described proposition); *id*. at page 8 of 20, bottom line (same); *id*. at page 10 of 20, second line from bottom (same).

79. Paragraph 84 of the original complaint (Document 2), while acknowledging that the Montreal Convention may apply, also alleges in the alternative that Plaintiff's damages may be compensable under more generally applicable principles of tort law to the exclusion of the Montreal Convention.

80. After filing the complaint in this action, and after AA had waived service of process but before AA filed its Rule 12 motion, and specifically on December 2, 2014, Plaintiff, through counsel, prepared and filed via ECF in the Bankruptcy Court the Notice of Withdrawal of Claim(s) that AA counsel had attached to the email described in paragraph 76, above.  A true copy of that document as filed is annexed hereto as **Exhibit H**.

81. Thus, even if the Montreal Convention applies, as AA has argued in its Rule 12 motion, Plaintiff has maintained a continuous and uninterrupted assertion of his claims under it from the time of filing Claim 6 in the Bankruptcy Court to the time of filing this action, and Plaintiff did not file the Notice of Withdrawal of Claim(s) that AA counsel had urged he file (see paragraph 76, above) until after Plaintiff had been informed that the stay had been lifted (see paragraph 77, above) and had filed this action.

82. The case of *Ireland v. AMR Corp.*, 20 F. Supp. 3d 341 (E.D.N.Y. 2014), which AA describes as "directly on point to the instant matter," ECF Document 12, page 18 of 20, first full paragraph, differs markedly from this case in that the plaintiff, Ireland, simply allowed the two-year period under the Montreal Convention to run, never filing any proof of claim in the bankruptcy court before filing suit in the district court nearly three years after the events giving

rise to the claim had occurred.[2]

83. The harms to and losses suffered by Plaintiff as hereinbefore alleged were not the result of an "accident [that] occurred during the course of embarking, disembarking, or on board an aircraft," *cf*. ECF Document 12, pages 6-7 of 20 (AA memorandum of law in support of Rule 12 motion) (defining applicability of Montreal Convention); *id*. at 11-12 of 20 (same).

84. The Montreal Convention does not apply to Plaintiff's claims against AA.

85. Alternatively to the foregoing paragraph, Plaintiff alleges that the Montreal Convention applies to Plaintiff's claims against AA, but further alleges that any such claims were timely asserted in this District before its Bankruptcy Court and were maintained there long enough so as to overlap temporally with any claims to which the Montreal Convention applies that may be asserted in this action.  A true copy of Plaintiff's Proof of Claim (Claim 6) with all its attachments as filed in the Bankruptcy Court on or about November 30, 2011, and withdrawn on December 2, 2014, is annexed hereto as **Exhibit J**.

86. Plaintiff's Proof of Claim included an express statement that Plaintiff did not concede that the Montreal Convention applied to Plaintiff's claims, see Exhibit J at fifth of nine pages, ¶ 15, but Plaintiff's Proof of Claim nevertheless acknowledged AA's assertion that the Montreal Convention applied, see Exhibit J at second of nine pages, ¶ 2.  Plaintiff's Proof of Claim thus asserted claims under the Montreal Convention on the basis of AA's assertion but without waiver of the right to seek damages not covered by the Montreal Convention, as Plaintiff has subsequently and timely done in this action.

87. AA, as a common carrier of passengers by air, owes certain duties of care to its passengers, including but not limited to a duty to inform international passengers traveling

---

[2] Annexed hereto as **Exhibit I** is a true copy of a PACER transaction receipt generated 12/18/2014 showing "[n]o claims found" in the claims register for case number 11-15463-shl (the AA Bankruptcy) for any creditor named "ireland" that was filed or entered between 11/29/2011 (the date the petition was filed) and 12/18/2014 (the date the query was run).

through the United States that the baggage they have checked with AA, even if checked through to a final destination outside the United States, will be returned to such international passengers at throughpoints (i.e., a port that is not their final destination) located within the United States for inspection by CBP and/or local police enforcing state laws banning possession of certain objects even though that throughpoint located within the United States is not the passenger's final destination and even though the passenger undertook the international travel with no intention to possess his checked baggage within the United States.

88. AA, as a common carrier of passengers by air, owes certain duties of care to its passengers, including, without limitation, a duty not to affirmatively misinform international passengers traveling through the United States regarding the subject matter described in the foregoing paragraph.  AA or its employees or agents did in fact affirmatively misinform Plaintiff upon his specific inquiry when checking the bags, see paragraph 27, above.

89. Plaintiff was an international passenger traveling through the United States with baggage that he had checked with AA through to a final destination outside the United States (Jamaica), who had no notice or reasonable expectation that his checked baggage would be returned to him at JFK, and who undertook the international travel with no intention to possess his checked baggage and the nunchaku within it within the United States or any state therein.

90. The duty or duties described at paragraphs 87-88, above, is made all the more serious and consequential by the complexity of federal regulations and state laws of which AA, but not ordinary international passengers traveling between nations outside the United States, should reasonably be expected to be cognizant.

91. As to Plaintiff and his wife, AA breached the duty or duties described at paragraphs 87-88, above.

92. But for AA's breach, the arrest and detention of Plaintiff described herein would not have occurred.  Plaintiff would never have packed his nunchaku in his checked baggage (but

would simply have left that martial-arts weapon in Belgium) had he been aware of the potential consequences of doing so.

93. Plaintiff's entire ordeal could readily have been prevented by AA's simply having provided Plaintiff accurate information.

94. AA engaged, intentionally or otherwise, in joint conduct with persons acting under color of state law to deprive Plaintiff of his federal rights by "setting him up" to be arrested for possession of nunchaku even though it was never Plaintiff's intention to have nunchaku on his person or under his control while passing through the United States while traveling from Belgium to Jamaica.

95. AA intentionally, recklessly, or negligently caused Plaintiff's damages by instituting and implementing procedures that exposed Plaintiff to the wrongful arrest, confinement, and mistreatment that occurred at the hands of persons acting under color of state law.

## **FIRST CAUSE OF ACTION**

96. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

97. Police Officer MAURICE MURPHY and Police Officer "JOHN DOE No. 1," acting under color of state law, falsely arrested Plaintiff, charging him with a misdemeanor, and thereafter searching and detaining him, all in violation of the Fourth and Fourteenth Amendments.

98. The false arrest, searches, and detention have caused and/or continue to cause Plaintiff deprivation of his liberty, physical and psychological pain and suffering, mental anguish, humiliation, reputational injury, and/or other losses.

## SECOND CAUSE OF ACTION

99. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

100. Police Officer MAURICE MURPHY, and Police Officers "JOHN DOE" numbers 1-3, acting under color of state law, used unreasonable force against Plaintiff under the circumstances, and in a manner degrading to human dignity, by repeatedly threatening him, squeezing his genitals and humiliating him in public view and in view of his wife, depriving him of food, water, and medication (the last of which, i.e., the Ventolin® inhaler, they had actually seized from him), by forcefully banging his head against the police car while his hands were cuffed behind his back, by exacerbating his asthma with smoke from incense while he was confined and refusing to stop exposing him to the smoke, by putting him in a crowded cell where he had to stand overnight, and by effectively administering sleep-deprivation coercion during the hours leading up to his arraignment and plea.

101. The conduct described in paragraph 100, above, has caused and/or continues to cause Plaintiff fear, physical and psychological pain and suffering, mental distress, and other harms and losses, for which redress is sought under the Fourth and Fourteenth Amendments to the United States Constitution.

## THIRD CAUSE OF ACTION

102. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

103. Police Officer MAURICE MURPHY, and Police Officers "JOHN DOE" numbers 1-3, acting under color of state law, deprived Plaintiff of his constitutional right to a fair trial by subjecting him to the conditions described in paragraph 100, above, by preventing him from communicating with his wife, who was alone at the airport, and by thereby coercing him into

entering a guilty plea to a violation, all in violation of the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution.

## FOURTH CAUSE OF ACTION

104. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

105.  Up to and including the Date of the Arrest, Defendant THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and/or the PAPD *__had__* adequately and appropriately trained its police officers that the application of New York's ban on nunchaku to nunchaku found in the checked baggage of foreign citizen martial artists passing through New York's airports who have no intention of retrieving such nunchaku from their luggage while in the State and no intention of remaining in New York would be void for vagueness as applied and/or should not be enforced in such circumstances.

106. Police Officer MAURICE MURPHY and Police Officer "JOHN DOE No. 1," acting under color of state law, disregarded or ignored that training, subjecting them to individual liability.

107. This Fourth Cause of Action is pleaded in the alternative to the Fifth Cause of Action, and incorporates by reference the deprivation of Plaintiff's constitutional rights alleged in the First through Third and Seventh Causes of Action.

## FIFTH CAUSE OF ACTION

108. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

109. Up to and including the Date of the Arrest, Defendant THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and/or the PAPD *__had not__* adequately and appropriately

trained its police officers that the application of New York's ban on nunchaku to nunchaku found in the checked baggage of foreign citizen martial artists passing through New York's airports who have no intention of retrieving such nunchaku from their luggage while in the State and no intention of remaining in New York would be void for vagueness as applied and/or should not be enforced in such circumstances.

110. Such failure of the Defendant THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and/or the PAPD to train their employees amounts to deliberate indifference to the constitutional rights of others, *see, e.g., City of Canton v. Harris*, 489 U.S. 378, 385 (1989), giving rise to a *Monell* claim cognizable at law.  Plaintiff has suffered as a result of such deliberate indifference to his constitutional rights.

111. This Fifth Cause of Action is pleaded in the alternative to the Fourth Cause of Action, and incorporates by reference the deprivation of Plaintiff's constitutional rights alleged in the First through Third and Seventh Causes of Action.

## SIXTH CAUSE OF ACTION

112. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

113. Defendants THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and THE CITY OF NEW YORK, as well as their police forces, the PAPD and the NYPD, respectively, owed a duty of care to Plaintiff to prevent the injuries sustained by him.

114.  Police Officer MAURICE MURPHY and/or one or more of Police Officers "JOHN DOE" numbers 1-3 were unfit and/or incompetent for their positions.

115. Defendants THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and/or THE CITY OF NEW YORK was or were negligent in its/their hiring and/or retention of Police Officer MAURICE MURPHY and/or one or more of Police Officers "JOHN DOE"

numbers 1-3, which negligence proximately caused some or all of Plaintiff's injuries.

116. This Sixth Cause of Action incorporates by reference the deprivation of Plaintiff's constitutional rights alleged in the First through Third and Seventh Causes of Action.

## SEVENTH CAUSE OF ACTION

117. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

118. The treatment of Plaintiff by Defendants THE CITY OF NEW YORK and/or by THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY and/or by  Police Officer MAURICE MURPHY and/or by one or more of Police Officers "JOHN DOE" numbers 1-3, in comparison to the gravity of the "offense" with which Plaintiff was charged and in comparison to his actual conduct and *mens rea*, amounted to cruel and unusual punishment, in violation of the Eighth Amendment to the United States Constitution.

## EIGHTH CAUSE OF ACTION

119. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 66 as if fully set forth herein.

120. Police Officer MAURICE MURPHY and/or Police Officer "JOHN DOE No. 1," acting under color of state law, seized from Plaintiff's checked baggage, and have never returned to Plaintiff, his personal effect and property (namely, the folding knife that was in his checked baggage on the Date of the Arrest), all without due process of law, in violation of the Fourth and Fifth Amendments to the United States Constitution.

121. This cause of action would not have been brought, and Plaintiff would willingly have forfeited both his knife and his nunchaku, had Police Officer MAURICE MURPHY not arrested Plaintiff and subjected to him to the treatment complained of herein.

## NINTH CAUSE OF ACTION

122. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 121 as if fully set forth herein.

123. The breach of duties as a common carrier and other culpable misconduct described at paragraphs 87-95, above, by AA has caused or contributed to all of the harms to and losses suffered by Plaintiff as hereinbefore alleged, for which Plaintiff seeks compensatory damages, which are not limited by the Montreal Convention but arise under the application of more generally applicable principles of tort law to the exclusion of said Convention's putative limitations, *see, e.g., Acevedo-Reinoso v. Iberia Líneas Aéreas de España S.A.*, 449 F.3d 7 (1st Cir. 2006).

124. This Ninth Cause of Action is pleaded in the alternative to the Tenth Cause of Action.

## TENTH CAUSE OF ACTION

125. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs 1 through 121 as if fully set forth herein.

126. Plaintiff has satisfied all conditions precedent to bringing suit should the Montreal Convention apply (which Plaintiff has alleged it does not and which AA has argued it does), having timely filed Claim 6 on or about November 30, 2011, and having maintained Claim 6 in this District's Bankruptcy Court until this action was filed, as hereinbefore detailed.

127. Should the Montreal Convention apply, Plaintiff seeks damages accordingly.

128. This Tenth Cause of Action is pleaded in the alternative to the Ninth Cause of Action.

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants as follows:

(a) on the First through Fourth Causes of Action, compensatory and punitive damages in an amount to be determined at trial, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

(b) on the Fifth through Seventh Causes of Action, compensatory damages in an amount to be determined at trial, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

(c) on the Eighth Cause of Action, equitable relief (e.g., order compelling return of property) and/or compensatory damages in an amount to be determined at trial, and reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

(d) on the Ninth and Tenth Causes of Action, compensatory damages in an amount to be determined at trial; and

(e) such other, further, and different relief as this Court may deem just and proper.

Dated: January 2, 2015
[corrected to delete AMR Corporation as a named party on January 13, 2015]
Port Washington, New York

_____/s_____
JAMES M. MALONEY (JM-5297)
*Attorney for Plaintiff*
33 Bayview Avenue
Port Washington, NY 11050
(516) 767-1395
maritimelaw@nyu.edu